# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| CATHLEEN KENNEDY, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) CAUSE NO. 1:13-cv-1103-WTL-TAB ) |
| THE LILLY EXTENDED DISABILITY PLAN, | ) ) |
| Defendant. | ) |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Before the Court are the parties' cross motions for summary judgment. The motions are fully briefed, and the Court, being duly advised, **GRANTS** the Plaintiff's motion [Dkt. No. 35] and **DENIES** the Defendant's motion [Dkt. No. 40] for the reasons set forth below. In addition, the Court **DENIES AS MOOT** the Plaintiff's Motion To Determine the Standard of Adjudication [Dkt. No. 34].

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II. BACKGROUND

The facts of record relevant to the Court's decision are as follow.[1]

Defendant Lilly Extended Disability Plan ("the Plan") is an employee benefit plan for employees of Eli Lilly and Company ("Lilly"). Plaintiff Cathleen Kennedy was an employee of Lilly and, as such, participated in the Plan.

Kennedy began working at Lilly in 1982. In January 2007, Kennedy began experiencing symptoms that continued to worsen and eventually led to a diagnosis of fibromyalgia in April 2008. By December 2007, her symptoms had become so severe that she determined she was no longer able to work. Kennedy eventually applied for long-term disability benefits under the Plan; those benefits were approved effective May 1, 2009. The applicable definition of "disability" in the Plan at that time was, in relevant part, "the inability of an Employee to engage,

---

[1] The medical evidence in the record is extensive and includes Kennedy's treatment for a variety of conditions. Because the Court understands Kennedy to assert that she is disabled due to the symptoms of fibromyalgia, the Court has focused its recitation of the facts on those relevant to that condition.

2

for remuneration or profit, in any occupation commensurate with the Employee's education, training, and experience." Record at 131.

In 2010, Anthem Life and Disability ("Anthem"), the Plan administrator, reviewed Kennedy's claim. By that time, the Plan's definition of "disability" had been amended. The new version provided two definitions of "disability." The one that applied to Kennedy in 2010—because she had not been receiving benefits for more than 24 months at that point—was the inability to perform her own occupation. Anthem had Kennedy complete a questionnaire about her activities and symptoms and requested and reviewed records from Dr. John Condit, Kennedy's treating rheumatologist, as well as her treating psychiatrist and urologist. Anthem then requested a peer review from Dr. Ara Dikranian, who is board certified in rheumatology and internal medicine.[2] Dr. Dikranian opined that Kennedy "is noted in the submitted documentation to have fibromyalgia that has been poorly characterized. There is no evidence that her fibromyalgia is functionally impairing her ability to work." Indeed, his opinion was that "[t]he internal medicine progress notes reviewed do not document a diagnosis of fibromyalgia nor signs or symptoms to support this diagnosis." *Id.* at 895. Dr. Dikranian concluded:

> There is no documentation from her clinical assessment that the claimant has significant functional impairments; given the diagnosis and her chronic pain, it is reasonable to restrict her push/pull/life/carry to no heavier than 50 pounds ever, limiting 20 to 50 pounds to occasionally and up to 20 pounds frequently. No restrictions on sitting, standing, walking, reaching in all directions, fingering, handling, bending, kneeling, crouching, climbing are supported.
>
> There are inconsistencies of the claimant's self reports and observed behaviors and the clinical findings. The submitted medical records do not document functional impairment severe enough to support her inability to perform in any work capacity. The restrictions and limitations stated above would accommodate the pain the claimant experiences upon certain activities, but does not preclude her from ability for full time work.

---

[2]Anthem also obtained a peer review from a psychiatrist, Dr. Marcus Goldman, who opined that Kennedy was not functionally impaired from a psychological standpoint.

*Id.*

In September 2010, at Anthem's request, Kennedy underwent an independent medical examination performed by Dr. Steven Neucks, a rheumatologist.[3] After reviewing Kennedy's medical records and examining her, Dr. Neucks concurred with the diagnosis of fibromyalgia: "This patient clearly has fibromyalgia. This is documented by my exam, the exam of Dr. Condit, her general internist, and she meets the current rheumatology guidelines. . . . I believe her diagnosis is well established." *Id.* at 375. With regard to the question of whether Kennedy suffered from a condition that impaired her ability to perform activities of daily living or to work, Dr. Neucks opined:

> Fibromyalgia clearly can impact the patient's ability to work. Fortunately, they do not seem to have impacted her ADL activity nor much of her self-care functioning. The patients with fibromyalgia have multiple issues. One is pervasive fatigue. This is aggravated by difficulty with insomnia and the need to take multiple medications some of which are fatiguing. Many of the patients note that they have to get steady rest and pace themselves during the day or else their fatigue and then their pain becomes increasing. As fatigue and stress increases, the patient's cognitive issues often referred to as "fibro-fog" appear to gradually worsen. This patient notes that she had difficulty functioning at her high-paced job with lots of stress and lots of hours at work, but does much better at home. She notes that although she is relatively functionally capable at home, she limits her activities and spaces them with times of rest during the day. The patients with fibromyalgia have well documented difficulty doing repetitive tasks and have difficulty doing heavy tasks and posture maintenance. These would all be required in the patient's job as well as the ability to be sharp clinically and mentally on a relatively consistent basis for multiple hours during the week. Additionally, the patients with fibromyalgia have flares. These flares cause them to have to limit their activities severely for a day or two. These clearly could not be well accommodated in a high functioning job such as the patient had previously. . . .
>
> Overall, I think there is a good correlation with this patient who I thought was honest and forthright. The patient questionnaire provided by the insurance company also reveals levels of functioning that are quite consistent with what the patient told me during the consultation. The reports from Dr. Condit's office are

---

[3]Kennedy also underwent a psychiatric IME by Dr. Vahid Osman, who concluded that she had no restrictions or limitations from a psychiatric standpoint.

> similarly appropriate in defining the patient's physical capacities. These are quite consistent with the patient's report on the fibromyalgia impact questionnaire. I do not get the sense that the patient is trying to exaggerate her symptoms to fulfill a mission or for secondary gains. These are quite consistent with my physical findings and I think represents a clear and reliable history.

*Id.* at 375-76. Dr. Neucks opined that Kennedy "cannot do sustained high stress activities over 40 to 50 hours a week," and that she "has to be able to maintain her regimen of rest and exercise and to be in a relatively modified or stress free environment." *Id.* at 376. He opined that she was limited to lifting 25 pounds occasionally and 15 pounds frequently; she needed to avoid repetitive, high-volume activity; she would need the ability to get up and move around for several minutes every hour; she would need to take off one or two days per month for "restoration"; posture maintenance would be "difficult" for her; and she was limited to working 30-35 hours per week at a low-stress job. *Id.* As a result of these restrictions, he opined that she was unable to return to her previous job as a Human Resources Director/Manager, which was an executive level position that indisputably was not "low-stress" and which required more than 40 hours per week and a high level of cognitive function. He further opined that the expected duration of her impairment would be two years from the date of his exam.

In April 2011, Anthem obtained an annual disability update form from Kennedy and an attending physician statement from Dr. Condit, who opined on May 11, 2011, that Kennedy could not work "full-time in a role with significant responsibilities," could not "return to work doing complex tasks," and would, in his opinion, "never" "recover sufficiently to perform the duties of" either her regular job or "any other type of work." *Id.* at 50-51.

In March 2012, Sedgwick Claims Management Services ("Sedgwick") became the administrator of the Plan. In June 2012, Lilly asked Dr. Condit again to complete an Attending Physician Statement form and provide updated office notes. The instructions to Dr. Condit

stated: "We require objective clinical information that supports your patient's inability to return to work due to reduced functional capacity." *Id.* at 1029. Dr. Condit listed Kennedy's diagnoses as nonarticular rheumatism, fibromyalgia, sleep disorder, depression, irritable bowel syndrome, and restless leg syndrome. He indicated that he believed Kennedy to be permanently disabled and unable to "remain on feet for >1 hour at a time or sit at desk for >2 hrs. straight." *Id.* at 1031. Where asked to "[d]escribe objective/clinical findings to warrant disability, including severity and duration based [sic] the patient's presentation during office visits," Dr. Condit wrote "diffuse pain, sleep disorder, fatigue." *Id.* at 1030. In his office notes dated June 21, 2012, he noted that "[i]n general, she has done fairly well. Cannot explain the flare of pain in her thighs." *Id.* at 1033. A representative of Sedgwick spoke with a member of Dr. Condit's staff and reported that he or she was informed that Dr. Condit "does not do any Functional Capacity exams and there is no other information in regards to her functional status and limitations" other than that reported in the Attending Physician Statement. *Id.* at 1704.

In July 2012, Sedgwick advised Kennedy that it would be referring her to a physician of its choice for a medical examination. By that time, Kennedy was subject to a new definition of "disability" in the amended Plan because she had received benefits for more than 24 months. The operative question was now whether she was unable to "engage, for remuneration or profit, in any occupation consistent with [her] education, training, and experience." *Id.* at 1727.

Sedgwick referred Kennedy to Dr. Robert Schriber, a rheumatologist in Dayton, Ohio.[4] Kennedy underwent the examination on August 30, 2012. Dr. Schriber opined: "American

---

[4]Kennedy notes that Dayton is more than 100 miles from her home. Lilly, in turn, notes that when Sedgwick informed Kennedy that it was having difficulty finding a rheumatologist in the Indianapolis area to perform the IME and suggested that it be conducted by a pain medicine specialist instead, Kennedy balked at that idea, explaining her understanding that fibromyalgia is

6

College of Rheumatology does not consider fibromyalgia to be disabling on a long-term basis. There is no evidence for any potentially disabling rheumatic illness present in this individual. I believe she is capable of any form of employment that would be appropriate for a 51-year-old woman. Certainly she is capable of executive-level activities." *Id.* at 1050. Dr. Schriber was asked whether Kennedy's condition was "considered totally disabling." *Id.* at 1051. Dr. Schriber stated that Kennedy's "primary symptom is pain," "there is no medical evidence to support a disabling health condition, and "there are no disabling signs/objective findings in the medical record." *Id.* Dr. Schriber stated that Kennedy's "treatment plan does seem appropriate with the exception that she should be encouraged to undertake a physical regimen including aerobic conditioning to attain a heart rate of 80% of max for her age for 40 minutes four days a week followed by stretching." *Id.* Dr. Schriber concluded that Kennedy had no restrictions, she was able to return to work as an executive, and that she did not have any cognitive or safety issues that would impact her work ability. *Id.*

In a letter dated November 1, 2012, Sedgwick informed Kennedy that it had concluded that she no longer satisfied the eligibility requirements under the Plan. The letter cited the definition of "disability" contained in the December 2007 Plan, before the most recent amendment: "the inability of an Employee to engage, for remuneration or profit, in any occupation *commensurate with* the Employee's education, training, and experience, provided that the inability results from an illness or accidental bodily injury that requires the Employee to be under the regular care of a Licensed Physician." *Id.* at 564. The letter explained that

> [t]he determination to deny your continuation of Plan benefits is based on a
> review of the following medical documentation:

---

typically treated by rheumatologists, not pain medicine specialists, and offered to travel to Chicago, which is farther from her home than Dayton.

> An Independent Medical Exam ("IME") report provided by Rheumatologist, Robert A. Schriber, M.D. dated August 30, 2012. The IME report indicates that the American College of Rheumatology does not consider Fibromyalgia to be disabling on a long-term basis, and it was determined that there is no evidence for any potentially disabling rheumatic illness present. In addition, Dr. Schriber indicates you are capable of any form of employment, including executive-level activity, and that the medical evidence does not support a disabling health condition.
>
> Medical reviewed from Rheumatologist J. Michael Condit, M.D. received on June 21, 2012. The Attending Physician Statement provided indicates you are disabled; however, your musculoskeletal exam found that all joints were found to be normal. You have normal range of motion without tenderness in your left and right hips. You exercise 30-45 minutes a day that includes stretching, strengthening and conditioning. Dr. Condit indicated you exercise and stretch well.
>
> Review of an IME provided by Rheumatologist, Steven H. Neucks, M.D. dated September 30, 2010. It indicates that you have relatively high functioning, you are able to perform activities of daily living, you are able to jog three miles a day and you are able to do routine social functioning. Dr. Neucks notes you were unable to return to a position that is high stress and a position that required extended hours (over 40 to 50 hours). Dr. Neucks also notes that although you would not be able to work your current job, your restrictions do not preclude your performance of any type of occupation.
>
> Review of an IME provided by Psychiatrist, Vahid Osman, M.D. dated September 1, 2010. It indicates that although you have been diagnosed with Major Depressive Disorder and Anxiety Disorder, you are not restricted or limited from working.

*Id.* at 565. Kennedy's disability benefits were terminated effective December 1, 2012.

On February 2, 2013, Kennedy submitted an appeal of the termination of her disability benefits. In her letter initiating the appeal, Kennedy described her examination by Dr. Schriber as follows:

> This exam was significantly different from the past two MEs. It consisted of him asking me a few questions and doing a physical exam that lasted less than 5 minutes.
>
> I first went to his office where he asked me a few questions including 1) why don't you work?, 2) what medications are you taking and 3) Are you being treated

> by a rheumatologist? I had written out my medications ahead of time, he had no follow-up questions.
>
> Next he took me to an exam room. He asked me to change into an exam gown and left the room. He returned to examine me. His exam consisted of feeling my neck. Next he had me move my knees from side to side and asked me if it hurt. He then asked me if I exercise and I explained that I jog and stretch 3-5 times per week based on how I feel. He commented that he recommends to his fibromyalgia patients that they exercise 40 minutes at 80% of their maximum heart rate, 5 times per week.
>
> He shook my hand and said goodbye. The total exam lasted no longer than 5 minutes. I called my husband to come pick me up.

*Id.* at 24 (footnote omitted). Kennedy disputed Dr. Schriber's comment that the American College of Rheumatology does not consider fibromyalgia to be disabling on a long-term basis, noting that he cited to no source for that statement and citing herself to the College's website that describes fibromyalgia as a "chronic" condition. Kennedy also noted that Dr. Daniel Clauw, an expert consultant used by Lilly in conjunction with Cymbalta, a drug that it markets for the treatment of fibromyalgia, has referred to fibromyalgia as a disabling condition, both in the continuing legal education context and in testimony before the Senate. *Id.* at 23-24 (quoting Dr. Clauw's Senate testimony).

In support of her appeal, Kennedy also submitted two letters from Dr. Neucks, who had become Kennedy's treating rheumatologist after Dr. Condit retired. In the first, dated December 30, 2012, he opined that Kennedy remained unable to perform her previous job because it "required a great deal of focus, attention, time, and involved a fair amount of stress." He noted that the medications she took for stress "decreases her cognitive function and exacerbates her previous functional impairment in this area." *Id.* at 62. He further noted "[l]ong term use of these medications has not been found to be helpful in fibromyalgia and so we will be trying to

9

limit the doses that she is taking. This will further impair her ability to deal with stress on a long-term basis." *Id.* In the second letter, dated February 27, 2013, he opined:

> Because of her pain, poor quality sleep, fatigue, and difficulty concentrating, I do not believe she can do high stress activities, or activities that require multitasking or high cognitive intensity.
>
> Because of her fibromyalgia and degenerative arthritis, as well as her underlying discomfort, I do not think that she can work a regular work schedule.
>
> She does receive some relief from medications, but she finds that increasing the doses causes cognitive impairment.
>
> We are currently revamping her medications including decreasing some of her benzodiazepine medication. This causes her to be somewhat uncomfortable.
>
> She was last seen in my office on February 21, 2013. Her physical examination continues to show the presence of tender points and degenerative arthritis.
>
> Overall, I thought at the last visit that her function level had declined slightly and that her anxiety was significantly worse.

*Id.* at 66.

As part of the appeal process, Lilly obtained a "peer file review" from Dr. Dayton Payne, who is board certified in rheumatology and internal medicine.[5] Dr. Payne reviewed the file regarding Kennedy's claim for disability and was asked to determine whether she was unable to "engage, for remuneration or profit, in any occupation consistent with [her] education, training, and experience." *Id.* at 8. He opined that she was not; in fact, he opined that she was able to return to her past job, explaining:

> The clinical findings in this medical record are the historical features of diffuse pain with stiffness and tenderness. There is mention of fatigue, irritable bowel (although the symptoms are not given), and interstitial cystitis. Also noted are depression, anxiety, and attention deficit disorder. All of the laboratory date in this file are normal. The examination data reveal no abnormalities by any examiner other than diffuse tenderness and tender points. There is mention of the

---

[5]Peer reviews also were obtained from a urologist, who opined that Kennedy was not disabled from a urological standpoint.

affective symptoms by the psychiatric consultant. The clinical findings as provided in this file do not support restrictions or limitations on activities.

*Id.* at 9.

On March 25, 2013, the Lilly Employee Benefits Committee ("EBC") met to consider Kennedy's appeal. The EBC used the amended definition of "disability"—"the inability of an Employee to engage, for remuneration or profit, in any occupation consistent with the Employee's education, training, and experience"— rather than the previous "commensurate with" version cited by Sedgwick in its denial letter.[6] By letter dated April 2, 2013, Lilly denied Kennedy's appeal. With regard to Kennedy's claim that she was disabled due to the symptoms of fibromyalgia, the letter summarized the September 30, 2010, IME by Dr. Neucks, the May 11, 2011, and June 14, 2012, Attending Physician Statements from Dr. Condit, the December 30, 2012, and February 27, 2013, letters from Dr. Neucks, and the review conducted by Dr. Payne. It also noted that Kennedy's application for disability benefits from the Social Security Administration had been denied. The letter stated "[w]hile the Committee determined that, from a rheumatology perspective, you may be precluded from performing your prior human resources executive position, it also determined that the documentation provided does not support your inability to perform other occupations consistent with your education, training and experience as of December 1, 2012, or since," explaining:

> The Committee concluded that, while the submitted medical documentation revealed that fibromyalgia is primarily the condition causing some restrictions and limitations for work, there is no clinical evidence to support that the severity of your conditions, either individually or in combination with one another, would preclude you from engaging in every occupation that is consistent with your education, training, and experience, including various non-executive positions in compensation, benefits, and other human resource fields. Based on the information you provided, related documentation and the applicable Plan

---

[6]The parties dispute whether the two definitions are synonymous; the Court need not resolve that dispute.

11

> provisions, the Committee determined that you are not disabled under the terms of the Plan. As a result the Committee found that you are not eligible for EDL benefits from and after December 1, 2012.

*Id.* at 1528-29. Finally, the letter informed Kennedy that "[t]he EBC's decision regarding your request for disability benefits is final and conclusive."

### III. **INITIAL MATTERS**

Before the Court addresses the substantive issues in this case, there are two collateral issues that must be addressed. First, in addition to her motion for summary judgment, Kennedy has filed a separate motion entitled Motion to Determine the Standard of Adjudication. It is not necessary for the Court to address Kennedy's argument that Sedgwick's initial denial decision is subject to *de novo* review by the Court, because, as explained below, Kennedy prevails even under the more stringent arbitrary and capricious standard. The Court notes, however, that it agrees with Lilly that filing a separate motion regarding the standard of review was procedurally improper and essentially an end-run around the page limit imposed on Kennedy's brief. While the impropriety had no practical effect in this case, Kennedy's counsel is advised against filing that type of separate motion in future cases without first seeking leave of court to do so.

Second, the Court recognizes that Lilly has moved to strike certain portions of Kennedy's statement of material facts, largely on the ground that certain facts are not supported by citation to evidence of record. In the future, counsel should note these types of objections in its statement of material facts in dispute, assuming that the facts in question actually are subject to dispute. Clearly many of them in this case are not, and thus it is unclear to the Court why Lilly would bother moving to strike them. Asking the Court to strike, to give but one example, the assertion that "Ms. Kennedy subsequently was approved for disability benefits under the

Extended Disability Plan"—a fact that not only is undisputed but is, in fact, contained in Lilly's own statement of facts—serves no purpose.

## IV. **DISCUSSION**

Kennedy filed this action pursuant to the applicable provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking the Court's review of Lilly's decision to terminate her long-term disability benefits. The parties agree that it is appropriate for this Court to review the EBC's (and therefore Lilly's final) decision to terminate Kennedy's benefits under the abuse of discretion standard because the Plan documents expressly give Lilly the discretionary authority to determine eligibility for benefits. Kennedy argues that the initial decision by Sedgwick should be reviewed *de novo*; however, because Kennedy prevails even under the abuse of discretion standard, it is not necessary to address that argument.

The abuse of discretion standard of review is deferential, of course, but it "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009). The Seventh Circuit has explained that "arbitrary-and-capricious review turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Id.* at 484 (quoting *Leger v. Tribune Co. Long Term Disab. Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)). In *Majeski*, the court explained that "a plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id.*

13

Lilly argues that the EBC's decision was "overwhelmingly supported by the evidence in the record," citing to nine opinions that it characterizes as supporting the denial of benefits and only two that do not. However, two of the nine "supporting" opinions relate only to psychiatry, and another two relate only to urology, leaving only five relevant to the issue of whether Kennedy is disabled as a result of fibromyalgia.[7] One of those five is the denial of benefits by the Social Security Administration which occurred in 2010 and therefore was not based on all of the evidence that was before the EBC when it made its decision. Indeed, Lilly itself *granted* Kennedy disability benefits prior to that time based upon the "any occupation" standard, making the Social Security Administration's contrary decision of questionable relevance.

That leaves the peer review conducted by Dr. Dikranian, the IME report from Dr. Schriber, the peer review of Dr. Payne, and the various opinions of Dr. Neucks. Dr. Dikranian's review was conducted in July 2010 and is primarily based on his belief that Kennedy's diagnosis of fibromyalgia was itself not supported by the record. The EBC did not credit this opinion of Dr. Dikranian—it specifically found that "fibromyalgia is primarily the condition causing some restrictions and limitations for work." Lilly also appears to disavow reliance on Dr. Schriber's opinion on the very next page of its brief. *See* Dkt. No. 41 at 25 ("Kennedy raised her concerns about Dr. Schriber's exam with the EBC and, in the end, the EBC took those concerns into consideration and relied primarily on other evidence."); *see also id.* at 23 ("[The EBC] did not

---

[7]The Court does not mean by this discussion to endorse this "keeping score" method. Clearly one well-reasoned and well-supported opinion can provide sufficient support for a decision, even if there are more opinions in the other column. The Court is simply addressing the particular argument made by Lilly.

14

rely on Dr. Schriber's IME as a key record, which moots Kennedy's complaints about that exam.").[8]

On the other hand, the EBC specifically referenced the opinion of Dr. Payne as support for its denial of Kennedy's claim. Dr. Payne gave two reasons for his opinion that Kennedy was not precluded from any jobs. First he stated:

> The work-up data provided does not support restrictions or limitations on activities. No data provided with respect to testing is abnormal to any degree. The exam data are all normal other than mention of the affective symptoms. The muscular tender points are noted. There is no synovitis, weakness, atrophy, and no features of musculoskeletal damage. All other organ system exams are normal.

Record at 10. This is the same type of insistence on objective evidence to demonstrate the symptoms of fibromyalgia that was rejected in *Hawkins v. First Union Corp.*, 326 F.3d 914, 919 (7th Cir. 2003); *see also Holstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 769 (noting that Seventh Circuit has "rejected as arbitrary an administrator's requirement that a claimant prove her condition with objective data where no definitive objective test exists for the condition or its severity"). And while Lilly correctly cites *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007), for the proposition that a plan administrator may require objective evidence of "how much an individual's degree of pain or fatigue limits his functional capabilities," that does not appear to be the type of "missing data" Dr. Payne is referring to; rather, he refers to the

---

[8]There is good reason for Lilly to distance itself from Dr. Schriber's opinion, as it appears to be based not on any view of Kennedy's actual condition, but rather his unsupported assertion that the "American College of Rheumatology does not consider fibromyalgia to be disabling on a long-term basis." Thus, while his diagnosis was "fibromyalgia syndrome," he concluded that "[t]here is no evidence of any potentially rheumatic illness present in this individual" and "Mrs. Kennedy's primary symptom is pain. There is no medical evidence to support a disabling health condition." In other words, Dr. Schriber seems to hold the opinion that a person cannot be disabled based on fibromyalgia—or, more accurately, the symptoms of fibromyalgia—alone. The fallacy of that opinion is clear, and Lilly wisely does not attempt to justify it.

15

absence of the type of clinical signs (like synotvitis and musculoskeletal damage) the absence of which simply does not support a finding of an absence of disabling pain in a fibromyalgia patient. *See Hawkins*, 326 F.3d at 919 ("Pain often and in the case of fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less objectively . . . but the amount of pain and fatigue that a particular case produces cannot be."). If that was the type of information that Lilly required in order to continue Kennedy's benefits, it should have specifically told her that when it initially denied her claim. *See* 29 C.F.R. § 2560.503-1(g)(iii) (notice of adverse benefit determination must include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary"). It did not do so; therefore, she was not given the opportunity to correct that omission on appeal, thus denying her of a full and fair opportunity for review.

> The second reason given by Dr. Payne in support of his conclusion was:
>
> No clinical trial to date has shown that activity limitation is beneficial in improving to changing the natural history of fibromyalgia syndrome. In fact, persons are encouraged to normalization of vocation and avocational function. No hazard has ever been shown with this clinical perspective.
>
> As a result, from a rheumatology viewpoint, she would have no restrictions or limitations on activities.

Record at 10. This reason also is problematic. As best the Court can discern, what Dr. Payne means is that working likely will not make Kennedy's fibromyalgia worse and remaining off work will likely not make her fibromyalgia better. But that begs the question of whether the current state of Kennedy's fibromyalgia and the symptoms she experiences are incompatible with work. It also suggests that Dr. Payne, like Dr. Schriber, believes that fibromyalgia is never disabling.

That leaves the various opinions given by Dr. Neucks. As the EBC noted in its denial letter, Dr. Neucks's letter of December 30, 2012, opined that Kennedy could not perform her previous job but was silent as to whether she could perform other jobs. *Id.* at 62. In his February 27, 2013, letter, he opined that she could not "work a regular work schedule." *Id.* at 66. He further explained in that letter that increasing the dosage of her medication caused cognitive impairment, while decreasing the dosage caused "her to be somewhat uncomfortable." Finally, he noted that "at the last visit [February 2013] that her function level had declined slightly and that her anxiety was significantly worse." *Id.*

Dr. Neucks's letters do not, by themselves, provide support for the EBC's decision to terminate Kennedy's benefits, as the inability to work a regular schedule generally is not compatible with engaging in an occupation. *Cf. Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012) ("[W]hen a patient like Farrell is only unpredictably able to function in a normal work environment, the resulting intermittent attendance normally precludes the possibility of holding down a steady job.") (citing *EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 949–52 (7th Cir. 2001) (*en banc*)).[9]

Having examined the evidence cited by Lilly as supporting the EBC's decision and finding that none of it actually provides the necessary support, the Court is left to echo the conclusion drawn by the Seventh Circuit in *Hawkins*, 326 F.3d at 919: "[t]he record contains nothing more than scraps to offset the evidence presented by [Kennedy] and by [Dr. Condit]"

---

[9]Perhaps the EBC did not credit that part of Dr. Neucks's opinion, or perhaps it believes that the Plan's definition of disability does not require the ability to work a regular schedule, but there is no suggestion of either in the record. The Court does note that it is not entirely clear from the record and Lilly's briefs whether Lilly interprets the phrase "engage . . . in any occupation" as used in the Plan to mean working full-time or something less than full-time.

17

and, accordingly, the EBC's decision fails to satisfy even the deferential arbitrary and capricious standard.

> That leaves the issue of the proper remedy.
>
> In many ERISA cases where plans have acted improperly to deny benefits, a remand for further consideration is the appropriate remedy, but where the plaintiff was actually receiving disability benefits that were improperly terminated, as they were here, the Seventh Circuit directs that the more appropriate remedy is reinstatement of benefits that were being paid before the improper denial. *See Hackett [v. Xerox Corp. Long-Term Disab. Inc. Plan*, 315 F.3d [771], 775–76 [7th Cir. 2003] (reversing grant of summary judgment for plan and ordering reinstatement of benefits that were improperly terminated); *see also Halpin v. W.W. Grainger*, 962 F.2d 685, 697 (7th Cir.1992) (affirming reinstatement of benefits that were improperly terminated). "The distinction focuses on what is required in each case to fully remedy the defective procedures given the status quo prior to the denial or termination." *Hackett*, 315 F.3d at 776. And here, as in *Hackett*, "the status quo prior to the defective procedure was the continuation of benefits. Remedying the defective procedures requires a reinstatement of benefits." *Id., accord, Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 630 (7th Cir. 2005) (finding that where benefits had been terminated by improper procedures, the "appropriate remedy is an order vacating the termination of her benefits" and directing the plan to "reinstate retroactively the benefits").

*Gessling v. Group Long Term Disab. Plan for Employees of Sprint/United Management Co.*, 693 F.Supp.2d 856, 873 (S.D. Ind. 2010) (Hamilton, Circuit Judge, sitting by designation).

Here remanding "for further findings or explanations" would be a useless exercise because the Court has reviewed the evidence of record and determine that it does not offer any affirmative support for terminating Kennedy's benefits. As noted above, in this case the lack of objective evidence of Kennedy's functional limitations as a result of her subjective symptoms could have been fatal to Kennedy's claim for benefits had Kennedy been informed of the need to provide such evidence and been unable (or simply failed) to do so. But she was not informed of the need to do so, and it would be impossible for her to obtain such evidence now—she cannot go back in time and undergo testing to demonstrate what her functional capacity was as of December 1,

2012. Accordingly, the Court finds that the appropriate remedy in this case is the reinstatement of benefits.

## V. **CONCLUSION**

For the reasons set forth above, the Plaintiff's motion for summary judgment is **GRANTED** and the Defendant's motion for summary judgment is **DENIED**. The parties shall, **within 21 days of the date of this Entry**, file either a joint notice or, if they cannot agree, separate notices setting forth what issues, if any, remain to be resolved before final judgment is issued consistent with this Entry and what the final judgment should include.

SO ORDERED: 2/13/15

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication